Slip Op. 19-144

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HABAŞ SINAI VE TIBBI GAZLAR ISTIHSAL ENDÜSTRISI A.Ş. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| and | |
| **CHARTER STEEL and KEYSTONE CONSOLIDATED INDUSTRIES, INC.,** | **Before: Claire R. Kelly, Judge** |
| **Consolidated Plaintiff-Intervenors,** | **Consol. Court No. 18-00144** |
| v. | |
| **UNITED STATES,** | |
| **Defendant,** | |
| and | |
| **NUCOR CORPORATION ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the Department of Commerce's countervailing duty determination.]

Dated: November 19, 2019

<u>David L. Simon</u>, Law Office of David L. Simon, of Washington, DC, argued for Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş.

Russell A. Semmel, Arent Fox LLP, of Washington, DC, argued for Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S.  With him on the brief were Matthew M. Nolan and Leah N. Scarpelli.

Maureen E. Thorson, Wiley Rein, LLP, of Washington DC, for Nucor Corporation.  With her on the brief were Stephen Claeys and Derick G. Holt.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, argued for Defendant.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, L. Misha Preheim, Assistant Director, and Elizabeth Anne Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice.  Of counsel was Nathan P.L. Tubman, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, Department of Commerce.

Kelly, Judge:  This action is before the court on motion for judgment on the agency record.  See Pl.'s R. 56.2 Mot. J. Agency Rec., Dec. 3, 2018, ECF No. 25; Nucor Corporation's R. 56.2 Mot. J. Agency Rec., Dec. 3, 2018, ECF No. 27;  Consol. Pl. Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S.'s R. 56.2 Mot. J. Agency Rec., Dec. 3, 2018, ECF No. 32.  Plaintiff Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.Ş. ("Habaş"), Consolidated Plaintiff Icdas Celik Enerji Tersane ve Ulasim, A.S. ("Icdas"), and Consolidated Plaintiff and Defendant-Intervenor Nucor Corporation ("Nucor") challenge various aspects of the U.S. Department of Commerce's ("Department" or "Commerce") final determination in the countervailing duty ("CVD") investigation of carbon and alloy steel wire rod from the Republic of Turkey ("Turkey").  See Carbon and Alloy Steel Wire Rod From [Turkey], 83 Fed. Reg. 13,239 (Dep't Commerce Mar. 28, 2018) (final affirmative [CVD] determination & final affirmative critical circumstances determination in part) ("Final Results"), and accompanying Issues & Decision Memo. for Final Affirmative Determination, Mar. 19, 2018, ECF No. 20–4 ("Final Decision Memo"); see also Carbon and Alloy Steel Wire Rod From [Turkey], 83 Fed. Reg. 23,420 (Dep't Commerce May 21,

2018) (amended final affirmative [CVD] determination for [Turkey] and [CVD] orders for Italy and [Turkey]) ("CVD Order").

Habaş, Icdas, and Nucor commenced separate actions pursuant to Section 516A of the Trade Act of 1930, 19 U.S.C. § 1516a, and 28 U.S.C. § 1581(c) (2012),[1] which were later consolidated.  See Summons, June 19, 2018, ECF No. 1; Compl., July 12, 2018, ECF No. 6; Order, Sept. 20, 2018, ECF No. 23 (consolidating Court No. 18-00144, Court No. 18-00146, and Court No. 18-00148 under Court No. 18-00144).  Habaş and Icdas contest Commerce's application of adverse facts available after determining that Habaş and Icdas failed to report the use of the "Assistance to Offset Costs Related to AD/CVD Investigations" program ("Offset Program") as unsupported by substantial evidence and contrary to law.  See Memo. Supp. Mot. Pl. [Habaş] J. Agency Rec. Pursuant R. 56.2 at 11–24, Dec. 3, 2018, ECF No. 25 ("Habaş Br."); Consol. Pl. [Icdas] Memo. L. Supp. Mot. J. Agency Rec. Pursuant R. 56.2 at 6–10, Dec. 3, 2018, ECF No. 32 ("Icdas Br.").  Icdas also argues that Commerce's decision to treat this program as countervailable is unsupported by substantial evidence.  See Icdas Br. at 10–11.

Nucor separately argues that Commerce's selection of benchmark data to calculate the benefit associated with natural gas for less than adequate remuneration ("LTAR") is inadequately explained, does not represent the best available information, and is unsupported by substantial evidence and contrary to law.  Memo. Supp. Nucor's R. 56.2 Mot. J. Agency Record at 10–25, Dec. 3, 2018, ECF No. 28 ("Nucor Br.").  Nucor

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

requests the court to deny Habaş's and Icdas's motions for judgment on the agency

record and to only remand Commerce's selection of benchmark data.  See id. at 25; Resp.

Br. Def.-Intervenor [Nucor] at 7, Apr. 12, 2019, ECF No. 39 ("Nucor Resp. Br."); [Nucor's]

Reply Br. at 10, May 28, 2019, ECF No. 45 ("Nucor Reply Br.").  Defendant requests the

court to uphold Commerce's Final Results in their entirety.  See Def.'s Resp. Pl.'s &

Consol. Pl.'s Mots. J. Agency Rec. at 1, 40, Mar. 29, 2019, ECF No. 37 ("Def.'s Resp.

Br.").  For the reasons set forth below, the court sustains Commerce's application of an

adverse inference for the selection of facts available to Habaş and Icdas and remands

Commerce's selection of benchmark data for further consideration and explanation.

## BACKGROUND

Following petitions by domestic producers of wire rod, including Nucor, Commerce

initiated a countervailing duty investigation of carbon and alloy steel wire rod from Turkey

on April 17, 2017, pursuant to Section 702 of the Tariff Act of 1930, as amended, 19

U.S.C. § 1671a.  See Carbon and Alloy Steel Wire Rod From Italy and Turkey, 82 Fed.

Reg. 19,123 (Dep't Commerce Apr. 26, 2017) (initiation [CVD] investigations).[2]

Petitioners alleged that the Turkish Steel Exporters' Association ("TSEA") is an entity

controlled by the Government of Turkey ("GOT") that provided financial support to Turkish

exporters subject to anti-dumping and countervailing duty ("AD/CVD") investigations,[3]

---

[2]  The period of investigation is from January 1, 2016 to December 31, 2016 ("period of investigation" or "POI").  Preliminary Decision Memo. at 4.

[3]  TSEA, however, described itself as "a nonprofit business and trade association[,]" which "share[s] some part of its budget with the exporters subject to investigation."   GOT Initial Questionnaire Response at Ex. 29, CD 53, 87, bar code 3600503-35 (Jul7 27, 2017) ("GOT Initial Questionnaire Response").  TSEA also indicated that "no government agencies or authorities [are] responsible for administering this assistance."  Id.

which amounted to a countervailable subsidy.  <u>See</u> DOC Initiation Checklist at 21–22, PD 42, bar code 3565079-01 (Apr. 17, 2017).[4]  Petitioners also contended that Turkish wire rod producers purchased natural gas from the GOT for LTAR and received a countervailable subsidy.  <u>See</u> Decision Memo. for Preliminary Determination in [CVD] Investigation of Carbon and Alloy Steel Wire Rod from [Turkey] at 14–17, C-489-832, Aug, 25, 2017, <u>available at</u> https://enforcement.trade.gov/frn/summary/turkey/2017-18640-1.pdf (last visited Nov. 14, 2019) ("Preliminary Decision Memo.").  On June 2, 2017, Commerce selected Habaş and Icdas as mandatory respondents for individual investigation and issued questionnaires.  <u>See</u> Respondent Selection Memo. at 1, PD 67, bar code 3577988-01 (June 2, 2017); <u>see also</u> Preliminary Decision Memo. at 4.

On September 5, 2017, Commerce issued its preliminary determination.  <u>See</u> <u>Carbon and Alloy Steel Wire Rod From [Turkey]</u>, 82 Fed. Reg. 41,929 (Dep't Commerce Sept. 5, 2017) (preliminary affirmative determination & preliminary affirmative critical circumstances determination in part), and accompanying Preliminary Decision Memo. Commerce preliminarily determined that Habaş benefitted in its purchase of natural gas from GOT for LTAR, by comparing prices Habaş paid to a benchmark price in accordance with the three-tiered analysis set out in 19 C.F.R. § 351.511(a)(2) (2017).  <u>See</u> Preliminary Decision Memo. at 14–17.  Commerce considered Turkey's domestic prices to be distorted and selected data from the International Energy Administration ("IEA") as the

---

[4] On August 21, 2018, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination, on the docket, at ECF No. 20-5–6.  Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices.

benchmark.  See id. at 16.  Further, Commerce did not find Habaş or Icdas used the

GOT's Offset Program, because "[t]he company respondents reported that they did not

receive benefits under the under the programs during the POI or [average useful life of

the subsidy.]"  Id. at 29–30.

Between January 18, 2018 and February 1, 2018, Commerce conducted

verifications, and on March 28, 2018, Commerce issued its Final Results.  See Final

Results, 83 Fed. Reg. at 13,240.  Having discovered unreported information regarding

the Offset Program at verification, Commerce selected from facts otherwise available with

an adverse inference to calculate subsidy rates for Habaş and Icdas, because it found

that neither company acted to the best of its ability.   See id.; see also Final Decision

Memo. at 4–7.  Commerce assigned Habaş and Icdas respective subsidy rates of 3.86

percent and 3.81 percent.   Final Results, 83 Fed. Reg. at 13,240.[5]  Commerce also

reconsidered the use of IEA data as a benchmark and, instead, selected Russian Eurostat

data.  Final Decision Memo. at 13–14.

## JURISDICTION AND STANDARD OF REVIEW

The court exercises jurisdiction pursuant to 19 U.S.C. § 1516a and 28 U.S.C.

§ 1581(c) (2012), which grant the Court authority to review final determinations in a CVD

investigation.  "The court shall hold unlawful any determination, finding, or conclusion

---

[5] Following the parties' submission of ministerial error comments, Commerce issued a ministerial error memorandum and then published the amended final determination and CVD order.  See Ministerial Error Allegation Memo., PD 327, bar code 3706334-01 (May 3, 2018);  see also CVD Order.

found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce's Selection of Facts Otherwise Available with an Adverse Inference

In the final determination, Commerce applied an adverse inference to its selection of facts otherwise available in finding that both Habaş and Icdas used the Offset Program. See Final Decision Memo. at 4–7.  Habaş and Icdas argue that Commerce's application of an adverse inference is not supported by substantial evidence and is not in accordance with law.  See Habaş Br. at 11–23; Icdas Br. at 6–10.  As explained below, because Icdas and Habaş failed to provide information on the Offset Program in response to Commerce's questionnaires, Commerce reasonably used facts otherwise available and, given Habaş and Icdas did not act to the best of their respective abilities, applied an adverse inference.

In a CVD investigation, Commerce requires information from respondents and the foreign government to determine whether that foreign government provided a countervailable subsidy and, further, whether a countervailing duty must be imposed.[6] See 19 U.S.C. §§ 1671(a), 1677(5)(B); see also Fine Furniture (Shanghai) Ltd. v. U.S., 748 F.3d 1365, 1369–70 (Fed. Cir. 2014).  To analyze whether a subsidy is

---

[6] Under the statute, if Commerce determines that a foreign government or public entity "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," Commerce will impose a countervailing duty equal to the amount of the countervailable subsidy. See 19 U.S.C. § 1671(a); see also Delverde, SrL v. United States, 202 F.3d 1360, 1365 (Fed. Cir. 2000).

countervailable, Commerce determines whether, inter alia, a recipient receives a benefit as a result of that contribution.[7]  19 U.S.C. § 1677(5)(B).  The statute treats a benefit as conferred where goods are provided for LTAR.  Id. at § 1677(5)(E).  For a subsidy that confers a non-recurring benefit—or a subsidy "for which the benefit . . . extend[s] beyond the period that the subsidy was conferred"—Commerce will allocate that benefit to a company over time, corresponding to the average useful life ("AUL") of renewable physical assets.  Magnola Metallurgy, Inc. v. U.S., 508 F.3d 1349, 1352 (Fed. Cir. 2007); see also 19 CFR § 351.524.  Commerce will request information from respondents and the foreign government probative of whether, and when, a countervailable subsidy has been conferred.  See Fine Furniture, 748 F.3d at 1369–70.  That information is subject to verification.  See 19 U.S.C. § 1677m(i).

If, however, a respondent fails to provide information, Commerce will use facts otherwise available to fill resulting information gaps and reach a determination.  See 19 U.S.C. § 1677e(a).  Once Commerce determines that facts otherwise available are warranted, Commerce may also draw an adverse inference, should it also find that a respondent has failed to cooperate by not acting to the best of its ability.[8]  See id. at §

---

[7] Commerce must also determine whether a foreign government provides a financial contribution and whether that financial contribution is specific.  See 19 U.S.C. 1677(5)(B) (defining subsidy); see also 19 U.S.C. §§ 1677(5)(D)–(E), 1677(5A) (defining financial contribution, benefit, and specificity).

[8] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination.  See, e.g., Final Results, 83 Fed. Reg. at 13,240; Final Decision Memo. at 4–7.  However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and, second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available."  See 19 U.S.C. § 1677e(a)–(b).

1677e(b).   To determine whether a respondent cooperated to the best of its ability, Commerce will assess whether the respondent "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Commerce reasonably selected facts otherwise available and applied an adverse inference in its selection of those facts.   Commerce found that the record lacked necessary information concerning Habaş's and Icdas's use of non-recurring subsidies based upon the AUL, and not merely the POI.   See Final Decision Memo. at 5. Commerce, therefore, reasonably found it necessary to fill this informational gap with facts otherwise available. Id. at 4–5. Further, Icdas and Habaş each failed to completely answer questions regarding the Offset Program and to do so by specified deadlines. Id. at 5–6. In its initial questionnaire, Commerce specifically requested information both from the period of investigation as well as the longer 15-year AUL period. See, e.g., DOC Questionnaire at II-2, III-19, PD 68, bar code 3579371-01 (June 8, 2017) ("DOC Questionnaire").[9]   Further, Commerce asked the GOT about the Offset Program, and whether the respondents, Habaş and Icdas, had used the program. See [GOT] Initial Questionnaire Response at 94, CD 53, 87, bar codes 3600503-01, 3600503-35 (July 27, 2017) ("GOT Initial Questionnaire Response").   The GOT replied that "[t]here is no such

---

[9] At Section II (addressed to GOT), Commerce advised that because "the AUL is 15 years" in this case, "you must provide information concerning 'non-recurring' subsidies . . . approved or disbursed during the AUL." See DOC Questionnaire at II-8. Further, at Section III (addressed to respondents), Commerce indicated that it was investigating non-recurring subsidies during the AUL period. Id. at III-3, III-19, III-21.

. . . support program" and referred to the TSEA's answers to the questionnaire appendices. See id. at 94, Ex. 29. TSEA stated that "[n]one of the respondent companies received any assistance during the POI" and "[h]ence, the remaining questions . . . are not responded." Id. at Ex. 29. Habaş and Icdas also each indicated that they did not receive any assistance from TSEA and, therefore, did not respond to the remaining questions.[10] See Habaş Initial Questionnaire Response at 39, CD 46, bar code 3600040-01 (July 27, 2017) ("Habaş Questionnaire Response"); Icdas Resp. to Sec. III Questionnaire at III-47, CD 117, bar code 3601330-02 (July 27, 2017) ("Icdas Questionnaire Response"). However, at verification, Habaş, and Icdas each confirmed that such a program existed and that they had received payments from it during the AUL period.[11] See DOC Verification Report Re: Habaş at 10, PD 308, bar code 3679012-01 (Mar. 1, 2018) ("Company officials stated that the program is still active but the board of

---

[10] Habaş contends that, "even if there were a gap in the record, Commerce must follow 19 U.S.C. § 1677m(d)," which requires Commerce to promptly inform the submitter of a deficient response to a request for information. See Habaş Br. at 20–21. This argument is misplaced. Commerce reasonably believed the record to be complete, because the respondents indicated that they did not receive support from TSEA in their questionnaire responses. See Final Results at 5; see also Habaş Questionnaire Response at 39; Icdas Questionnaire Response at III-46. Moreover, neither respondent indicated that it was not compelled to report the Offset Program in its responses, because Commerce had reviewed that program in a separate proceeding—an argument both now make. See Habaş Br. at 15–16; Icdas Br. at 7–8. Given the state of the record, Commerce was not aware of any purported deficiency.

[11] Habaş argues that Commerce's interest in the Offset Program did not extend beyond the POI. See Habaş Br. at 7. As support, Habaş refers to Commerce's supplemental questionnaire, in which Commerce asked Habaş to "explain if you received any other assistance from any other investigation during the POI to assist offset costs related to AD/CVD investigations" and, if so, to "respond to all allocations in the . . . Grant Allocation Appendix." Id.; see also Habaş Supplemental Questionnaire at 5, CD 172, bar code 3608588-01 (Aug. 17, 2017). Habaş focuses on Commerce's reference to "POI" yet disregards the question's reference to the appendix. The Grant Allocation Appendix specifically queries information on the prior 14 years for each non-recurring subsidy received during the POI. See DOC Questionnaire at III-21. Thus, the question did not "exclude[] other portions of the AUL[,]" but included the AUL. See Habaş Br. at 7.

the [TSEA], which approves payment under this program, decided not to disburse finds

for 2016.");   see also Verification Report for Icdas at 11, PD 306, bar code 3678403-01

(Mar. 1, 2017) ("[Company officials] explained that the[] fees represent payments received

to offset the costs of conducting AD/CVD investigations during [2014]."). The

respondents provided too little information and confirmed the existence of the Offset

Program too late.[12]   Therefore, Commerce's decision to rely on facts available and to

apply an adverse inference was reasonable and supported by substantial evidence.[13]

    Before the court, Habaş and Icdas point to other parts of the record, which, in their

view, report the Offset Program.  See Habaş Br. at 13–16; Icdas Br. at 8–10.  Specifically,

Habaş appended Commerce's final determination in an administrative review on rebar

steel ("Rebar II") to its supplemental questionnaire responses.  See Habaş Supplemental

---

[12] Commerce had no obligation to request or accept new factual information, after discovering a response could not be corroborated at verification.  See Tianjin Machinery Import & Export Corp. v. United States, 28 CIT 1635, __, 353 F. Supp. 2d 1294, 1304 ("Verification is intended to test the accuracy of data already submitted, rather than to provide a respondent with an opportunity to submit a new response."); see also Uniroyal Marine Exports Ltd. v. U.S., 33 CIT 803, 808–09, 626 F. Supp. 2d 1312, 1316–17 (2009) (holding that Commerce's decision to reject untimely filed factual information was reasonable and supported by substantial evidence).

[13] Habaş argues that "Commerce's decision to select the highest available AFA rate was inconsistent with the statutory mandate[,]" because, to do so, "Commerce must make a specific factual determination, pursuant to 19 U.S.C. § 1677e(d)(2)" and "evaluate 'the situation that resulted' in the application of AFA."  Habaş Br. at 22.  Habaş explains that had Commerce evaluated the situation, "it would not have found that Habaş failed to report the AUL benefit in the first place, and it would not have found that Habaş withheld any information or failed to cooperate."  Id. at 22.  Defendant considers that Habaş had an opportunity to challenge the application of the highest adverse facts available rate before Commerce but did not.  Def.'s Resp. Br. at 20–23. Defendant argues Habaş is now barred from raising this argument because it failed to exhaust administrative remedies.  Id.  Whether or not Habaş failed to exhaust its administrative remedies, Commerce, did evaluate the situation that resulted in the application of AFA, contrary to Habaş's contentions.  Commerce reasonably determined that, because Habaş did not report the Offset Program until verification, it did not cooperate to the best of its abilities, meriting an adverse inference in the selection of facts otherwise available.  See Final Decision Memo. at 4–7.

Questionnaire at Ex. 4, CD 172, bar code 3608588-01 (Aug. 17, 2017) ("Habaş

Supplemental Questionnaire") (attaching Issues & Decision Memo. for Final Affirmative

Determination in [CVD] Investigation Steel & Concrete Reinforcing Steel from [Turkey],

C-489-830,          (May.          15,          2017),          available          at

https://enforcement.trade.gov/frn/summary/turkey/2017-10505-1.pdf  (last  visited  Nov.

14, 2019)).  Moreover, in attaching the final determination of another proceeding, Habaş

did not argue that the Offset Program was not countervailable; and, it did not bring Rebar

II's reference to the Offset Program to Commerce's attention.  See Habaş Br. at 13–16;

see also Habaş Supplemental Questionnaire at 2, Ex. 4.  Yet, according to Habaş,

because Rebar II referred to the Offset Program, it was "in plain sight[.]"  See Habaş Br.

at 15; see also Reply Br. Pl. [Habaş] at 1–3, May, 28, 2019, ECF No. 43 ("Habaş Reply

Br.").  Icdas, too, refers to another proceeding, namely another administrative review on

rebar steel ("Rebar I").  See Icdas Br. at 7–8 (citing Steel Concrete Reinforcing Bar From

[Turkey], 82 Fed. Reg. 26,907 (Dep't Commerce June 12, 2017) (final results & partial

rescission), and accompanying Issues & Decision Memo., C-489-819, (June 6, 2017),

available at  https://enforcement.trade.gov/frn/summary/turkey/2017-12108-1.pdf  (last

visited Nov. 14, 2019)).  Since Commerce had determined that the benefit under the

Offset Program had been "expensed",[14] in that proceeding, Icdas explains to the court, it

did not include the program in its reporting in this proceeding.  See Icdas Br. at 3, 7–10;

---

[14] Although Icdas may have had a "reasonable belief that the program was not countervailable
during the current POI[,]" a respondent's reasonable belief does not excuse the failure to report
requested information.  See Icdas Br. at 10; see also Nippon Steel, 337 F.3d at 1383 ("[T]here is
no mens rea component to the section 1677e(b) inquiry [to apply an adverse inference].").

see also Reply Br. Consol. Pl. [ICDAS] to [Def.'s Resp. Br.] at 3–7, May 28, 2019, ECF No. 44 ("Icdas Reply Br.").  However, like Habaş, Icdas referred to Rebar I to Commerce in respect to the countervailability of a separate grant program.  See Icdas Questionnaire Response at III-21, III-42; see also Icdas Supplemental Questionnaire Response at S2-12, PD 217, 218, bar code 3609227-01 (Aug. 17, 2017) ("Icdas Supp. Questionnaire Resp.").  Pointing generally to a final determination in a separate proceeding that happens to mention the Offset Program, yet is proffered in direct response to questions regarding an entirely different grant program, neither advises Commerce as to the existence of the Offset Program nor is probative of whether that Offset Program conferred a countervailable subsidy in the instant proceeding.[15]  Rather, by specifically asking about the Offset Program, it was "reasonable for Commerce to expect that more forthcoming responses should have been made[.]"  See Nippon Steel, 337 F.3d at 1383.

Further, Icdas contends that, based on Commerce's determination in Rebar I that the Offset Program's benefits had been expensed prior to the POI, the Offset Program is not countervailable in this administrative review.  See Icdas Br. at 10–11; see also Icdas Reply Br. at 7–10.[16]  However, Commerce considers the record before it and is not bound

---

[15]  In its supplemental questionnaire, Commerce informed Icdas that "references to the Department's final results in [Rebar I] are not sufficient to demonstrate that a program is not countervailable, as the Department considers the records of separate proceedings to be distinct."  Icdas Supp. Questionnaire Resp. at S2-12.  Commerce indicated to Icdas that it required a more complete response.  Id.

[16]  Icdas also contends that "nothing bars Commerce from considering decisions in the context of a proximate proceeding involving the same subsidy, the same respondent, the same production facility, and similar products."  Icdas Reply Br. at 3–4.  In making that argument, Icdas attempts to draw a parallel between Commerce's practices of relying on corroborated rates from earlier segments of the proceeding and of transferring non-proprietary information from one proceeding to another.  See id.  Even if Commerce has such discretion, Icdas does not provide any authority as to why Commerce must exercise that discretion here.

by its decisions in separate proceedings.  See Essar Steel Ltd. v. United States, 678 F.3d

1268, 1277 (Fed. Cir. 2012).  Given neither respondent confirmed the existence and use

of the Offset Program during the AUL period in this proceeding, Commerce's application

of facts available with an adverse inference was reasonable.

## II.  Commerce's Selection of Benchmark Data

Nucor challenges Commerce's selection of Russian Eurostat data over two other

potential data sources—i.e., IEA data and GTA data[17]—claiming the choice of Russian

Eurostat data is inadequately explained and unsupported.  Nucor Br. at 1–2, 9; Nucor

Reply Br. at 1–2.  Defendant disagrees on both counts.  See Def.'s Resp. Br. at 24–40.

For the reasons that follow, Commerce's selection of Russian Eurostat data on this record

is not reasonable.

Commerce imposes a countervailing duty when it determines that a foreign

government provided a financial contribution resulting in a benefit to the recipient, where

the government's provision of goods is for LTAR. 19 U.S.C. § 1677(5)(E).  Commerce

measures the adequacy of remuneration "in relation to prevailing market conditions for

the good . . . being provided" in the country subject to review.  19 U.S.C. § 1677(5)(E)(iv).

Its regulations set out a hierarchy of methodologies to identify the appropriate benchmark.

19 C.F.R. § 351.511(a)(2).  Under the "tier one" benchmark, Commerce compares the

"government price to a market-determined price for the good or service resulting from

---

[17] Habaş provided benchmark data from the Global Trade Atlas ("GTA"), Eurostat, and Energy Experts international.  See Letter From Habaş re: Benchmarking Data, PD 101, bar code 3599709-01 (July 26, 2017).  Nucor submitted benchmark data from the IEA.  See Nucor Deficiency Comments, PD 193–94, bar codes 3607060-01, 3607062-01 (Aug. 11, 2017).

actual transactions in the country in question." Id. at § 351.511(a)(2)(i).[18]  If country market prices are not available, then under the "tier two" benchmark, Commerce "compar[es] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."[19] Id. at § 351.511(a)(2)(ii).  Should that benchmark also be unavailable, Commerce will measure remuneration with the "tier three" benchmark, which "assess[es] whether the government price is consistent with market principles." Id. at § 351.511(a)(2)(iii).

Here, in Commerce's investigation of respondents' purchases of natural gas for power generation—i.e., natural gas in its gaseous form exclusive of compressed natural gas ("CNG") and liquified natural gas ("LNG")—from the GOT, Commerce benchmarked the GOT's natural gas prices against a "world market price" and ultimately selected Russian Eurostat data to do so.  See Preliminary Decision Memo. at 15–16; Final Decision Memo. at 13–14.  In the preliminary determination, Commerce selected IEA data as the "world market price" with which to compare the GOT's prices, because IEA data reflected prices available to Turkish purchasers[20] and, in a prior proceeding, Commerce

---

[18] Commerce concluded there was no usable market-determined tier one benchmark because of the GOT's "overwhelming involvement" in Turkey's natural gas market, which distorts private transaction prices.  Preliminary Decision Memo. at 15–16; see also Final Decision Memo. at 13.

[19] If there is more than one commercially available world price, Commerce "will average such prices to the extent practicable[.]"  19 C.F.R. § 351.511(a)(2)(ii).

[20] Commerce, in the preliminary determination, considered that IEA data to reflect prices available to Turkish purchasers.  However, in the final determination, Commerce made no mention of this preliminary finding.  While Commerce is not bound to its preliminary determination, Commerce

(footnote continued)

determined IEA data to be more accurate than GTA data.[21]  See Preliminary Decision

Memo. at 16–17.  However, in the final determination, Commerce relied upon Russian

Eurostat data.  See Final Decision Memo. at 13.  Although Commerce explained its

reasons for rejecting GTA compared to IEA data,[22] Commerce did not provide any

explanation for rejecting the IEA data or compare that data source with the Russian

Eurostat data.  Compare Final Decision Memo. at 12–13 (explaining that the GTA data

"likely covers both natural gas and compressed natural gas . . . . that distort the value of

the data") with id. at 13 (merely noting that "the IEA information is not the best information

on the record").  Commerce also made no finding that the IEA data was unusable or

otherwise unavailable, unlike the GTA data.  Id. at 12–13.  Rather, having eliminated GTA

data as a possible benchmark data source, two possible benchmark data sources—IEA

---

must explain why the IEA data's merits—inclusive of whether it reflects natural gas availability to Turkish producers—is a reasonable basis to reject that data.  See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("[P]reliminary determinations are 'preliminary' precisely because they are subject to change.").  Commerce, on remand, should clarify whether and which data source or sources reflect natural gas that is available to Turkish purchasers.

[21] Commerce explained that the IEA data included country-specific natural gas prices for Organisation for Economic Co-operation and Development countries, including Turkey. Preliminary Decision Memo. at 16.  Further, given that natural gas may only be transported via pipeline, Commerce noted that Turkish natural gas consumers would not be able to purchase gas outside of OECD Europe.  Id.

[22] Habaş advocated for the use of GTA data over IEA data, because, in Habaş's view, the IEA data was not reliable or usable.  See Habaş Case Br. at 13–17, CD 300, bar code 3681094-01 (Mar. 9, 2018).  Commerce rejected each concern, explaining, inter alia, that it disagreed with Habaş that the IEA data did not contain information on the methodology used to obtain prices or pricing information by user-specific categories.  See Final Decision Memo. at 12–13.  Further, Commerce explained that it considered GTA data to be "unusable for this investigation," because the GTA data "likely covers both natural gas and compressed natural gas . . . . that distort the value of the data presented by Habaş."  See id. at 12.

and Russian Eurostat—remained.  Commerce did not explain why the IEA data was "not

the best information on the record" but only stated that it "decided against using the . . .

the IEA data[.]"  Id.  If the IEA data was not usable, then Commerce should explain so;

otherwise, a bald assertion that the IEA information is "not the best information on the

record" does not articulate a reasonable explanation for rejection.  See Baroque Timber

Indus. (Zongshan) Co., Ltd. v. United States, 38 CIT __, __, 971 F. Supp. 2d 1333, 1339

(2014) (citing Burlington Truck Lines, Inc. v. United States, 317 U.S. 156, 168 (1962)).

Nor does Commerce adequately explain why the Russian Eurostat data is the best

available data.  Consistent with the regulatory preference that Commerce select a

benchmark price that would be available to in-country purchasers,[23]  Commerce

considered the "Russian export prices [to be] the best available data on the record . . .

because the information on the record shows that natural gas from Russia is available to

purchasers in via [sic] pipeline and the data only contains natural gas, exclusive of CNG

---

[23] In relevant part, the CVD Preamble notes, with respect to tier two benchmark prices, that Commerce "will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market." See Countervailing Duties, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998) (final rule) ("CVD Preamble").  To illustrate, Commerce contrasts two situations:

> [A] European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America. However, as another example, the world market price for commodity products, such as certain metals and ores, or for certain industrial and electronic goods commonly traded across borders, could be an acceptable comparison price for a government-provided good, provided that it is reasonable to conclude from record evidence that the purchaser would have access to such internationally traded goods.

Id., 63 Fed. Reg. at 65,377–78.

and LNG." Final Decision Memo. at 13 (citing 19 C.F.R. § 351.511(a)(2)(ii)).[24] Commerce referred to a pipeline map that, in its view, confirmed "natural gas, exclusive of CNG and [LNG], is only imported into Turkey via pipeline from Azerbaijan, Iran, and Russia." Id. (citing GOT Initial Questionnaire Response at Ex. 7C, pp. 22–23).  On that basis, Commerce selected Russian Eurostat data.[25]  See id.  However, between the premise— that natural gas enters Turkey via the mapped pipeline routes—and the conclusion that Russian Eurostat data is the "best available data on record"—Commerce's analysis elides several analytic steps in its Final Decision Memo. and fails to account for detracting evidence on the record.

First, it is unclear whether the Russian Eurostat data reflects natural gas, exclusive of CNG and LNG.  Habaş placed Eurostat data on the record to supplement GTA data[26] and provide a "stand-in for Russian export figures[,]" given that Russia does not provide

---

[24] Moreover, as Commerce noted in its preliminary determination, natural gas in its gaseous form may only be transported via pipeline.  See Preliminary Decision Memo. at 16.

[25] Nucor challenges Commerce's adoption of Russian prices, from the Eurostat data, as the world market price.  See Nucor Br. at 14–16; Nucor Reply Br. at 9–10.  Nucor alleges, that because the Russian government sets prices of natural gas, Russian Eurostat data cannot serve as a "world market price."  Nucor Br. at 14–16; Nucor Reply Br. at 9–10.  As Nucor clarified during oral argument, in its view, a world market price must be a market-determined price, i.e., a price that, like a tier one price, is free from government distortion. Oral Arg. at 6:30–9:02.  The regulations do not define "world market price."  Commerce must use a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii).  Thus, it is possible that other available prices, too, could be set by or otherwise distorted by a government; however, so long as that price is available to other purchasers in the world market—and presumably in competition with other countries' export prices—Commerce may rely upon such an available "world market price."

[26] Habaş included exhibits in its benchmark submission to "captur[e] international trade in natural gas from GTA as well as European imports of natural gas from Russia, from . . . Eurostat[,]" because gas pipelines connect Turkey to the European Union ("EU") and Russia.  Habaş Case Br. at 10 (citing Habaş Benchmark Data, PD 108, bar code 3599709-01 (July 26, 2017) ("Habaş Benchmark Data")).

value figures to GTA.  Habaş Benchmark Data, PD 108, bar code 3599709-01 (July 26, 2017).  Habaş indicated that both data sources reflect "HTS 2711.21, i.e. natural gas in its gaseous state."  Habaş Case Br. at 11; see also Habaş Benchmark Data at Exs. 3–5.[27]  Commerce, however, rejected GTA data because "the harmonized tariff schedule number 2711.21, on which Habaş's GTA data is based, likely covers both natural gas and compressed natural gas."  Final Decision Memo. at 12.  Commerce appears to have selected the Russian Eurostat data even though it, too, may contain CNG.[28]  Commerce does not address this evidence or explain why, unlike the GTA data,[29] the Russian Eurostat data reasonably reflect natural gas, exclusive of LNG and CNG.

---

[27] Exhibit 5 contains screenshots from the Eurostat website, which sorts "import" data "by HS6" and for "natural gas in its gaseous state."  Habaş Benchmark Data at Ex. 5.  Further, at Exhibit 3, Habaş included the definition of HS 2711.21, which, as reflected in the Harmonized Tariff Schedule for the United States, is "natural gas" in the "gaseous state."  Id. at Ex. 3.

[28] Defendant refers to Commerce's reasoning that "natural gas from Russia is available to purchasers in [Turkey] via pipeline and the data only contains natural gas, exclusive of [CNG and LNG]" as evidence that it is "reasonably discernable" that the "Eurostat data would not contain [CNG] and [LNG]."  Def.'s Resp. Br. at 35 (citing Final Decision Memo. at 13) (internal quotations omitted).  However, a step in Commerce's reasoning, as noted above, appears to be missing. Commerce fails to explain why the Russian Eurostat data would not contain CNG and LNG. Defendant, similarly, does not point to record evidence that supports Commerce's finding. Moreover, while Defendant acknowledges that "Nucor's case brief raised the issue that trade data for HTS 2711.21 would include the compressed natural gas[,]" it faults Nucor for "not plac[ing] any information on the record that indicated that Eurostat data is based on HTS 2711.21" and considers Nucor, by raising the issue now, to have failed to exhaust administrative remedies.  Id. However, it was Habaş, not Nucor, that placed the Russian Eurostat data on the record, and indicated it covered HTS 2711.21, like the GTA data.  See Habaş Case Br. at 11; see also Habaş Benchmark Data at Exs. 3–5.  Commerce, as explained above, must consider the record as a whole, including detracting evidence, notwithstanding which respondent places what evidence on the record.  See CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016); Altx, Inc. v. United States, 25 CIT 1100, __, 167 F. Supp. 2d 1353, 1374 (2001) (explaining that the agency "must address significant . . . evidence which seriously undermines its reasoning and conclusions").  Therefore, Defendant's exhaustion argument is inapposite.

[29] Defendant contends that a comparison of GTA and Russian Eurostat data is "moot" because,

Second, Commerce, in the final determination, did not address Nucor's arguments regarding alleged "weight and energy miscalculations" concerning Habaş's submission of the GTA and Eurostat data.  Compare Preliminary Decision Memo. at 16 with Final Decision Memo. at 11, 13–14.  Both data sets required conversion for comparison to the GOT's prices for natural gas to determine the adequacy of remuneration.  See Habaş Benchmark Data at 4–5.  Nucor identified several flaws in Habaş's conversion factors in its rebuttal case brief to Commerce.[30]  Nucor's Rebuttal Br. at 9–12, CD 302, bar code 3682688-01 (Mar. 13, 2018) ("Nucor Rebuttal Br."); see also Letter from Wiley Rein LLP to Sec. Commerce re: Rebuttal Information on Benchmark, PD 195, bar code 3607062-01 (Aug. 11, 2017).  Commerce, however, did not address these points in its final determination.  Instead, it accepted Habaş's corrections of conversion deficiencies "with respect to the GTA data."  See Final Decision Memo. at 12.  Commerce did not explain whether it also accepted Habaş's corrections of conversion deficiencies with respect to the Russian Eurostat data.  Moreover, even if Commerce's acceptance extended to Russian Eurostat data, Commerce nonetheless failed to address significant arguments

"[a]fter declining to use the [GTA] data for benchmarking purposes, it would have been inconsistent to then use the information to undertake the manner of comparative analysis advocated for by Nucor."  Def.'s Resp. Br. at 37.  Yet, in direct contradiction to this point, Commerce, immediately after rejecting GTA data, compared the reliability of GTA data with IEA data.  See Final Determination at 11–13.

[30] According to Nucor, Habaş applied the same density information to calculate natural gas price for all countries, when each country has its own density rate.  Nucor Rebuttal Br. at 10–11 (citing Letter from Wiley Rein LLP to Sec. Commerce re: Rebuttal Information on Benchmark at Ex. 2, PD 195, bar code 3607062-01 (Aug. 11, 2017)).  In addition, Nucor alleged that Habaş selected a calorific value "plucked from thin air" and incorrectly applied that one value to natural gas from all countries, when "Habaş' own submission shows that the calorific value of natural gas varies by source."  Id. at 11.

regarding the conversion of such data and Nucor's rebuttal evidence.   On remand, Commerce should address the suitability of the conversion factors.

Although Commerce may have discretion to choose among imperfect data sets, that choice must be explained.   See CS Wind Vietnam Co., 832 F.3d at 1373.   Here, "the path of Commerce's decision" is not reasonably discernable.   Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States, 41 CIT __, __, 222 F. Supp. 3d 1255, 1266–67 (quoting NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009)). Commerce offered no further explanation as to why Russian Eurostat data was the best available data and did not address detracting evidence on the record.   Rather, Commerce elevated the "availability" of the data source to the exclusion of other record evidence.

Given that Commerce failed to adequately explain its selection of Russian Eurostat data for the tier two benchmark, its decision is also not in accordance with law.   See SKF USA Inc. v. United States, 263 F.3d 1369, 1378 (Fed. Cir. 2001).   On remand, Commerce should elaborate as to why, given the asserted flaws of each benchmark data source, the choice of a tier two benchmark is nonetheless reasonable, and further, reconsider and explain the basis of its selection of benchmark data.

## CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that Commerce's final determination with respect to the selection of benchmark data is remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce's final determination is sustained in all other respects; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this data; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.


     /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated: November 19, 2019
      New York, New York